UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RUSSIA BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | 22 C 675 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| CHICAGO TRANSIT AUTHORITY and | ) | |
| AMALGAMATED TRANSIT UNION LOCAL 241, | ) | |
| | ) | |
| Defendants. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Russia Brown sued the Chicago Transit Authority ("CTA") and the Amalgamated Transit Union Local 241, alleging that both violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000e *et seq.*, and that CTA violated 42 U.S.C. § 1983 and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Doc. 1. CTA moves under Civil Rule 12(b)(6) to dismiss the § 1983 claim, and both Defendants move under Rule 12(b)(6) to dismiss the Title VII claims. Docs. 17, 19. Local 241's motion is denied, and CTA's motion is granted in part and denied in part.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, but not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Brown's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013)

1

(internal quotation marks omitted). The facts are set forth as favorably to Brown as those materials allow. *See Domanus v. Locke Lord, LLP*, 847 F.3d 469, 478-79 (7th Cir. 2017). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A. Brown's Complaints and Advocacy

Brown, a transgender man, started working for CTA as a bus operator in 2016. Doc. 1 at ¶¶ 8-9, 13-14. In 2017, a CTA employee objected to Brown's use of the men's restroom. *Id*. at ¶ 17. Although a CTA representative told Brown he could use the men's restroom, his general manager told him that he instead should use the clerk's restroom because it would be "safer" for him and that "no one should question [his] use of th[at] bathroom because 'everyone has been notified' of the issue." *Id*. at ¶¶ 17-18.

Brown alleges that his general manager's instruction exposed him to further mistreatment from those who did not previously know he was transgender. *Id*. at ¶ 18. Brown spoke with a representative from Local 241 about the incident, but the union did not take any action. *Id*. at ¶ 19. After Brown experienced continued harassment from coworkers, including death threats, he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in 2018. *Id*. at ¶ 24. (The complaint does not say what action, if any, the EEOC took on the 2018 charge.) Brown also reported the harassment to Local 241. *Id*. at ¶ 25.

In addition, Brown worked with the American Civil Liberties Union ("ACLU") in 2018 to address CTA's failure to cover necessary medical procedures for transgender employees. *Id*. at ¶¶ 20-21. CTA ultimately agreed to cover those procedures, including gender transition treatments. *Id*. at ¶ 22. Local 241's president "made disparaging remarks" about Brown's entitlement to medical coverage and "publicly criticized" his request that CTA cover those procedures. *Id*. at ¶ 26. Brown began receiving gender transition treatments after CTA agreed to

2

provide coverage, but he has not yet begun gender transition surgery, which is the final, most costly stage of his course of treatment. *Id*. at ¶¶ 23, 30.

> B. **Defendants' Responses to Brown's Complaints and Advocacy**

At some point after Brown made his complaints and engaged in his advocacy, CTA transferred his work location from the north side to the south side of Chicago. *Id*. at ¶ 27. Local 241's president told Brown that his "'bitching' would not work on the south side." *Ibid*. Brown has been disciplined for conduct even though similarly situated employees engaging in similar conduct were not. *Id*. at ¶ 28. In addition, he has experienced harassment from CTA employees and Local 241 members, including criticism of his efforts to have his transgender-related medical procedures covered. *Id*. at ¶ 29. After learning of a complaint that Brown had filed with the Illinois Labor Relations Board in 2021, Local 241 excluded him from a Facebook page it uses to update members on union activity. *Id*. at ¶¶ 39-41.

In June 2020, Brown requested FMLA leave. *Id*. at ¶ 31. Although CTA initially told Brown that he was eligible, it charged him with FMLA falsification and suspended him without pay in October 2020. *Ibid*. In addition, CTA required him to undergo two medical evaluations without granting provisional FMLA leave, contrary to CTA policy. *Id*. at ¶¶ 32, 34. After completing the second evaluation, CTA told Brown that he needed to complete a third exam, but each time he attempted to schedule the third exam, he was told to wait for instruction from CTA. *Id*. at ¶ 33. The third evaluation was never scheduled, and "someone from the MLS group"—which, according to a Google search performed by the court, is an independent provider of FMLA medical assessments—eventually informed Brown that the evaluation was cancelled. *Ibid*.

On January 7, 2021, CTA terminated Brown for FMLA falsification, citing as a justification his failure to undergo a third medical exam. *Id*. at ¶ 35. Brown alleges that

3

non-transgender CTA employees who requested FMLA leave were not charged with FMLA falsification or required to undergo multiple medical evaluations. *Id*. at ¶ 36. Brown also alleges that non-transgender CTA employees charged with FMLA falsification were not terminated. *Id*. at ¶ 37. According to Brown, CTA terminated him because it "did not want to continue covering the costs of [his] medical treatments for gender transition," using the FMLA falsification charge as a pretext. *Id*. at ¶ 38.

Before Brown was terminated, he asked Local 241 to help him challenge the FMLA falsification charge. *Id*. at ¶ 45. Local 241 falsely told him there was nothing it could do to grieve the charge before his termination and that he should accept the charge. *Id*. at ¶¶ 45-46. After his termination, Brown pursued a grievance through Local 241. *Id*. at ¶ 47. Although the collective bargaining agreement requires an accelerated grievance process for terminations, his grievance has been pending over a year. *Ibid*.

On April 30, 2021, Brown filed administrative charges with the EEOC and received right-to-sue letters authorizing suit against Local 241 and CTA. *Id*. at ¶¶ 3-4.

## Discussion

### I. Title VII Claims

Brown claims that CTA and Local 241 violated Title VII's anti-discrimination and retaliation provisions by working together to fire him because he is transgender and in retaliation for his 2018 complaints and advocacy. Doc. 1 at ¶¶ 42, 64, 71. Brown also alleges that CTA discriminated and retaliated against him by verbally harassing him, unfairly evaluating his performance, denying him FMLA leave, and charging him with FLMA falsification. *Id*. at ¶¶ 36-38, 64, 71. And Brown alleges that Local 241's refusal to grieve his FMLA falsification charge or pursue its accelerated grievance process to his termination resulted from discriminatory and retaliatory animus. *Id*. at ¶¶ 45-48, 71.

4

Defendants argue that Brown failed to exhaust his Title VII claims by (1) not timely filing his EEOC charge and (2) bringing claims here that exceed the scope of the charge. Doc. 18 at 4-8; Doc. 20 at 6, 8-9. Defendants also contend that the complaint does not plausibly state a Title VII discrimination or retaliation claim. Doc. 18 at 8-9; Doc. 20 at 9-15.

### A. Statute of Limitations

A plaintiff in Illinois who wishes to bring a Title VII claim in court must first file an administrative charge with the EEOC within 300 days of the allegedly unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 463 (7th Cir. 2016). Failure to file a charge within that time renders the claim untimely. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). That said, where "the plaintiff timely alleged a discrete discriminatory act[,] … acts outside of the statutory time frame may be used to support that claim." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 786 n.4 (7th Cir. 2004) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)); *see also EEOC v. Ind. Bell Tel. Co.*, 256 F.3d 516, 520 (7th Cir. 2001) ("Conduct more than 300 days before that charge cannot be reached under Title VII of the Civil Rights Act of 1964, though earlier events may be considered to place the more recent ones in context.").

Defendants argue that because Brown filed his EEOC charge on April 30, 2021, he cannot bring any Title VII claim arising from the restroom incident in 2017 or other events that occurred more than 300 days before April 30, 2021. Doc. 18 at 5-6; Doc. 20 at 6. Brown concedes that those events are not independently actionable, explaining that he alleges them only to provide context for discriminatory and retaliatory acts that took place within the 300-day limitations period. Doc. 22 at 8; Doc. 23 at 6-7. Although CTA notes that Brown does not provide dates for the alleged unfair performance evaluations and harassment, Doc. 26 at 5 n.1, Defendants do not contest that the denial of FMLA leave, the FMLA falsification charge, and

5

Brown's termination fall within the 300-day period. Doc. 26 at 4-5; Doc. 28 at 1. Thus, Brown may pursue his Title VII claims based on those acts and any others within the 300-day period, with the earlier events providing pertinent background. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 404 (7th Cir. 2008) ("As part of her offer of evidence of pretext, [the plaintiff] is permitted to look to events occurring prior to the 300-day limitations date.").

B.     **Scope of the Charge**

"[A] plaintiff filing suit in federal court may bring only those claims that were included in h[is] EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (internal quotation marks omitted). "Claims are 'like or reasonably related' when (1) there is a reasonable relationship between the allegations in the charge and the claims in the complaint and (2) the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Ibid*. (internal quotation marks omitted); *see also Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 503 (7th Cir. 1994) ("When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge."). "The standard is a liberal one," *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985), but "the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*," *Cheek*, 31 F.3d at 501.

CTA argues that Brown's sex discrimination claim falls outside the scope of his EEOC charge because the charge does not allege that CTA's asserted justification for his termination, FMLA falsification, was a pretext to discriminate against him because he is transgender. Doc. 26 at 5. That argument fails. Brown's EEOC charge describes the same conduct by CTA

6

as does the complaint. Doc. 18-1 at 1. True enough, the EEOC charge does not explicitly state—as does the complaint—that his FMLA falsification charge was a pretext for the true reason CTA fired him, namely, to stop paying for his gender transition treatments. *Compare ibid*. *with* Doc. 1 at ¶ 38. But "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Cheek*, 31 F.3d at 500. The EEOC charge sets forth allegations reasonably related to those in the complaint, including Brown's efforts to address CTA's "discriminatory medical policies," the "conflicting information" he received regarding the third medical exam that CTA cited for his termination, and the assertion that non-transgender employees were not subject to the same requirements for FMLA leave or terminated for FMLA falsification. *Compare* Doc. 18-1 at 1 *with* Doc. 1 at ¶¶ 21-22, 33, 36-37. Thus, the complaint's Title VII discrimination claim against CTA does not exceed the scope of Brown's EEOC charge. *See Babrocky*, 773 F.2d at 865-66 (holding that "an exact correspondence between the words of the EEOC charge and the judicial complaint" is not required because "the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow").

Local 241 argues that Brown's EEOC charge does not allege that it worked with CTA to terminate him. Doc. 20 at 8-9. That argument fails as well. The complaint's Title VII claims allege the same conduct and involves the same parties, Local 241 and CTA, as does the EEOC charge. Doc. 20-1 at 5-6. Granted, the charge does not explicitly allege that CTA and Local 241 worked together to terminate him, as does the complaint. *Compare ibid*. *with* Doc. 1 at ¶ 42. But that allegation "can be reasonably inferred from the facts alleged in the charge," *Cheek*, 31 F.3d at 503, given the charge's allegations that Local 241's president criticized Brown's request that CTA cover his transgender-related medical procedures, that Local 241 falsely told him it

7

could not grieve CTA's FMLA falsification charge and encouraged him to accept the charge, and that the union then failed to timely grieve his termination, Doc. 20-1 at 6. *See Chi. Tchrs. Union, Loc. 1 v. Bd. of Educ. of Chi.*, 419 F. Supp. 3d 1038, 1056-57 (N.D. Ill. 2020) (holding that the plaintiffs' disparate treatment claim was exhausted even though the EEOC charge made only a disparate impact claim, reasoning that the complaint "essentially t[ook] the same evidence supporting the disparate impact claim and argue[d] for an inference of intentional discrimination"), *aff'd sub nom. Chi. Tchrs. Union v. Bd. of Educ. of Chi.*, 14 F.4th 650 (7th Cir. 2021). Given that Brown's EEOC charge alleges that both Local 241 and CTA discriminated and retaliated against him in a manner that resulted in his termination, an EEOC investigation of the charge might reasonably reveal their cooperation with one another. *See Novitsky v. Am. Consulting Engineers, L.L.C.*, 196 F.3d 699, 701 (7th Cir. 1999) ("[W]e have stressed that the essential question is what EEOC investigation could reasonably be expected to grow from the original complaint.") (internal quotation marks omitted).

In pressing the contrary result, Local 241 relies on *Cheek*. Doc. 28 at 3. But in *Cheek*, the complaint's sex discrimination claim, which alleged that the plaintiff's district manager assigned her unprosperous sales routes, had a different factual basis and involved different individuals than her EEOC charge, which alleged that her sales manager required her to pay clients' insurance premiums. 31 F.3d at 502. Here, Brown's EEOC charge and complaint share a clear "factual relationship," fulfilling the charge's "dual purpose" of providing Defendants notice and the EEOC an opportunity to investigate. *Id*. at 501-02.

    C.    **Merits of Sex Discrimination Claim**

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination based on an employee's transgender status is a form of prohibited sex discrimination under Title VII. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741-43 (2020). "A complaint alleging sex discrimination under Title VII need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of … sex." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (internal quotation marks omitted); *see also EEOC v. Concentra Health Services, Inc.*, 496 F.3d 773, 781-82 (7th Cir. 2007) (noting the simplicity of pleading a Title VII discrimination claim).

Under that standard, the complaint's allegation that CTA denied Brown's request for FMLA leave, evaluated him unfairly, continued to harass him, and ultimately terminated him because he was transgender, Doc. 1 at ¶ 64, is sufficient to survive dismissal under Rule 12(b)(6). *See Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021) ("It is enough for a plaintiff to assert that she was treated worse because of protected characteristics. … Whether she can prove this is a subject for a later stage of the litigation."). Also sufficient is the complaint's allegation that Local 241 discriminated against Brown by working with CTA to terminate him and by failing to properly grieve CTA's FMLA falsification charge and his subsequent termination. Doc. 1 at ¶¶ 42, 48; Doc. 23 at 6.

Local 241's arguments for a contrary result are unpersuasive. First, Local 241 argues that it has no "affirmative duty to prevent racial harassment or other forms of unlawful discrimination in the workplace." Doc. 20 at 7 (quoting *EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 661 (7th Cir. 2003)). But Brown alleges that Local 241 directly discriminated against him "in the performance of its agency function," not that it "merely fail[ed] to effectuate changes in the workplace." *Pipefitters*, 334 F.3d at 659 ("[A] union that refuses to accept blacks as members, or refuses to press their grievances, is guilty of discrimination."); *see also Green v.*

9

*AFT/IFT Loc. 604*, 740 F.3d 1104, 1107 (7th Cir. 2014) ("If the union would have processed [a member]'s grievance or represented him … had he been white—or had he refrained from complaining about other discriminatory episodes—then the union violated Title VII.").

Local 241 also contends that its delay in pursuing Brown's grievance is not a materially adverse action. Doc. 20 at 10-12. Regardless of whether merely delaying the filing of a grievance is a materially adverse action, Brown claims that Local 241 did more than that—namely, working with CTA to terminate him, which indisputably is a materially adverse action. *See Pantoja v. Am. NTN Bearing Mfg. Co.*, 495 F.3d 840, 849 (7th Cir.2007) ("Termination is unquestionably a materially adverse action.") (internal quotation marks omitted). Local 241 retorts that Brown's claim that it worked with CTA to terminate him is too conclusory. Doc. 20 at 9. But the complaint provides enough facts to make it plausible that Local 241 did just that—its president "publicly criticized" Brown's request for CTA to cover his medical treatments, and when CTA falsely charged him with FMLA falsification and ultimately terminated him to stop covering those treatments, Local 241 encouraged him to accept the charge and did not follow its usual grievance procedure. Doc. 1 at ¶¶ 26, 38, 43-47; *see Nance v. Rothwell*, 2011 WL 1770306, at *6 (N.D. Ill. May 9, 2011) (holding that the complaint "creat[ed] a plausible inference that the two [defendants] worked together" by alleging that the plaintiff "was a thorn in both of their sides, and [one defendant]'s termination of his employment quickly followed [the other defendant]'s revocation of his security clearance").

Last, Local 241 argues that the complaint does not plausibly allege that it had a discriminatory motive because it does not identify a non-transgender union member's grievance that was processed differently. Doc. 20 at 13-14. This argument is a non-starter. As the Seventh Circuit has held, a "plaintiff is not required to identify similarly situated comparators at the

pleading stage." *Carlson*, 758 F.3d at 830; *see also Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) ("[The plaintiff] certainly does not need to identify … a similarly situated employee who managed to avoid termination."); *Graham*, 8 F.4th at 627 ("[F]act pleading to show a prima facie case is not needed in an employment-discrimination case.") (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). The complaint's allegations that Local 241's president made "disparaging remarks" about Brown's transgender status and pursuit of equal treatment and told him that his "'bitching' would not work on the south side" after his transfer there, Doc. 1 at ¶¶ 26-27, "allow for a *plausible* inference that the adverse action suffered was connected to h[is] protected characteristics," *Kaminski*, 23 F.4th at 777.

Local 241's assertion that "the words 'bitch' or 'bitching' do not create an inference of discriminatory animus without some further context," Doc. 28 at 6-7, is wrong. As an initial matter, those terms plausibly convey animus towards a transgender man. *See Passananti v. Cook Cnty.*, 689 F.3d 655, 665 (7th Cir. 2012) ("Additional evidence that 'bitch' is 'sex based' for purposes of establishing gender-based harassment is not necessary."). In any event, the thrust of the president's comment was that CTA personnel at the south side work location would be less accepting of his transgender status than personnel at the north side location.

> D.  **Merits of Retaliation Claim**

Title VII's antiretaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)). To state a Title VII retaliation claim, Brown must allege that: "(1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).

11

Defendants do not dispute that Brown engaged in statutorily protected activity in 2018, specifically, working with the ACLU to address CTA's failure to cover necessary medical procedures for transgender employees and filing a discrimination charge with the EEOC. And because Brown has sufficiently alleged adverse actions—unfair performance evaluations, continued harassment, denial of FMLA leave, and termination—under Title VII's anti-discrimination provision, there is no need to reconsider Defendants' same arguments in the context of his retaliation claim. *See Alamo v. Bliss*, 864 F.3d 541, 555 n.39 ("The range of conduct prohibited under [Title VII's] anti-retaliation provision is broader than its anti-discrimination provision. … [B]ecause [the plaintiff] clearly alleges an adverse *employment* action under Title VII's anti-discrimination provision, we need not consider the full breadth of Title VII's prohibition on retaliation.") (first alteration in original and citation omitted).

Defendants argue that Brown fails to plausibly allege a causal link between his 2018 protected activity and their 2020 adverse actions due to the gap in time between them. Doc. 18 at 7; Doc. 20 at 14-15. True enough, "[i]f the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed." *Carlson*, 758 F.3d at 828. "But no bright-line timing rule can be used to decide whether a retaliation claim is plausible," as "[o]ther factors can always be relevant," such as "an ongoing pattern of retaliation." *Id*. at 829.

The complaint plausibly alleges an ongoing pattern of retaliatory behavior against Brown by both CTA and Local 241. Between his 2018 protected activity and the denial of his FMLA leave and FMLA discipline beginning in 2020, CTA transferred him, unfairly evaluated his performance, disciplined him for behavior that others were not punished for, and verbally harassed him. Doc. 1 at ¶¶ 27-29. Around the same period, Local 241's president made

12

"disparaging remarks" about Brown and "publicly criticized" his protected activity, and it excluded him from its Facebook page and continuously harassed him. Doc. 1 at ¶¶ 26, 29, 39-41. Defendants' "parsing of events los[e] sight of the bigger picture," which sufficiently alleges a sufficiently ongoing pattern of retaliation to survive a motion to dismiss. *Carlson*, 758 F.3d at 829; *see also Conner v. Bd. of Trs. for Univ. of Ill.*, 2019 WL 5179625, at *8 (N.D. Ill. Oct. 15, 2019) (holding that the complaint sufficiently alleged an ongoing pattern of retaliation where the plaintiff's protected activity and harassment occurred over the same period and his coworkers made comments referring to his complaints). In the cases Local 241 cites for the contrary result, Doc. 20 at 14, the plaintiffs provided no additional allegations of retaliation within the lengthy gaps between their protected activity and the defendants' allegedly retaliatory acts. *E.g.*, *Carmody v. Bd. of Trs. of Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014) (holding that a three-year gap made the plaintiff's retaliation claim implausible, "at least where [the plaintiff] has given us no potential explanation for the long delay"); *Lugo v. Int'l Bhd. of Elec. Workers Loc. 134*, 175 F. Supp. 3d 1026, 1038-39 (N.D. Ill. 2016) (holding that the plaintiff's retaliatory termination claim with a one-year gap was implausible where the plaintiff "provide[d] no evidence of retaliation other than timing").

II.     **Equal Protection Claim**

Brown's § 1983 equal protection claim against CTA necessarily rests on a *Monell* theory. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To state a *Monell* claim, "[a] plaintiff must [allege facts] show[ing] that the violation was caused by (1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). Brown alleges that CTA formerly "had an express policy of depriving transgender employees with healthcare to cover

13

gender transition," and that after it agreed to provide coverage for transgender-related medical procedures, it "implicitly maintained" its former policy by firing Brown before his "gender reassignment surgery, the final and most costly part of the process." Doc. 22 at 7. CTA contends that these allegations are insufficient to state a widespread practice *Monell* claim because "his allegations are exclusively concerning his own treatment and do not mention the treatment of any other individuals." Doc. 18 at 11.

Running CTA's argument to ground would have no impact on the litigation at this juncture because, regardless of the answer, the case will remain in federal court (as Brown's Title VII claims survive), and because discovery on the Title VII and *Monell* claims will be coextensive (as both rest on the same factual predicate). Accordingly, the court declines to dismiss the *Monell* claim on the pleadings, knowing that it will have an opportunity to address the claim on the merits if CTA again challenges it on summary judgment.

### III.   Punitive Damages Against CTA

CTA moves to strike Brown's request for punitive damages, arguing that municipal corporations are immune from punitive damages. Doc. 18 at 12 (citing *Planned Parenthood Ass'n/Chicago Area v. CTA*, 767 F.2d 1225, 1233-34 (7th Cir. 1985)); *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."). Brown concedes the point and clarifies that he requests punitive damages only from Local 241. Doc. 22 at 2. CTA's motion to strike the complaint's request for punitive damages against it is accordingly granted.

## Conclusion

Local 241's motion to dismiss is denied. CTA's motion to dismiss is denied, except that its motion to strike Brown's request for punitive damages is granted. Defendants shall answer the complaint by November 24, 2022.

November 10, 2022

_____
United States District Judge