UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RUSSIA BROWN, | |
| Plaintiff, | No. 22 CV 675 |
| v. | Judge Georgia N. Alexakis |
| CHICAGO TRANSIT AUTHORITY and AMALGAMATED TRANSIT UNION LOCAL 241 | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Plaintiff Russia Brown, a former bus operator for the Chicago Transit Authority ("CTA"), was terminated after CTA concluded that he falsified leave under the Family and Medical Leave Act ("FMLA"). Brown sued CTA and his union, Amalgamated Transit Union Local 241 ("Local 241"), for unlawful discrimination on the basis of his gender identity in violation of Title VII of the Civil Rights Act of 1964, alleging that his firing had been pretextual and that his union had failed to properly advocate for him. Local 241 now moves for summary judgment. [110]. For the reasons given below, that motion is granted.[1]

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014);

---

[1] The Court addresses CTA's motion for summary judgment in a separate memorandum opinion and order issued this same day.

Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.     Threshold Issues

### A.     Local Rule 56.1 Statements & Statements of Additional Fact

At summary judgment, the local rules require that the moving party serve "a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a judgment as a matter of law." N.D. Ill. L.R. 56.1(a)(3); *see also Cracco v. Vitran Express, Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). The opposing party must then file a response to the movant's statement of material facts and may also assert any additional facts they wish not already set forth. N.D. Ill. L.R. 56.1(b)(2). Any facts asserted "must consist of concise numbered paragraphs" and "be supported by citation to the specific evidentiary material, including the specific page number, that supports it." N.D. Ill. R. 56.1(d). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3).

Local 241 argues that Brown's Rule 56.1 response and statement of additional facts [125] fails to properly support certain facts, *see, e.g.*, [135] at 8 n.4, and repeatedly fails to comply with the Rule 56.1(d)(1) requirement of "concise numbered paragraphs." The Court agrees that Brown's response and statement of additional facts suffers from these violations. Many paragraphs are improperly padded with

multiple facts in violation of Local Rule 56.1(d)(1), which requires "concise numbered paragraphs." S*ee, e.g.*, [136] ¶¶ 2–8. On other occasions, Brown fails to properly support certain facts with record evidence. *See, e.g.*, [136] ¶ 27 (Brown appears to cite to [127-9] for content of a text message conversation between a union representative and the union president, but the exhibit does not support the asserted facts); *id.* ¶ 16 (Brown alleges that initial CTA charging documents did not indicate Brown was being accused of FMLA falsification for failing to follow proper call-out procedures, but cited documents, *see* [127-8] at 3, specifically reference FMLA "falsification" and note that "there was no notification to the third party Reed" on 24 occasions).[2]

The Court is entitled to insist on "strict compliance" with the local rules. *Cracco*, 559 F.3d at 623 (cleaned up); *see also Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010). ("[A] district court may strictly enforce compliance with its local rules regarding summary judgment motions."). Where Brown has failed to comply with these rules—and, most significantly, where Brown has failed to support asserted facts with on-the-mark record evidence—the Court will treat properly asserted and supported facts in Local 241's filings as undisputed for

---

[2] Even more confusingly, in response to a separate asserted fact, Brown "does not dispute" that he was taken out-of-service without pay because he "falsified FMLA" and "had not followed the correct call-out procedure." [126] ¶ 30.

the purpose of summary judgment. *See* Fed. R. Civ. P. 56(e)(2); N.D. Ill. L.R. 56.1(e)(3).[3]

### B. Admissibility

Some of Brown's response and statement of additional facts presents admissibility concerns, which the Court addresses at the outset. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); [135] at 13 (Local 241 objects to Brown's reliance on hearsay to oppose its motion for summary judgment).[4]

First, Local 241 argues that Brown relied on inadmissible hearsay to allege that Local 241 President Keith Hill made certain statements to CTA manager Jairo Naranjo, who then related the conversation with Hill to another CTA manager, Gregory Middleton, on whose deposition Brown relies for Hill's statements. [135] at 13; [136] ¶¶ 5, 14. This is classic hearsay under Federal Rule of Evidence 801(c)—it is offered for the truth of whether Hill made the statements—and because CTA and

---

[3] As the Court notes in its accompanying memorandum opinion and order on CTA's motion for summary judgment, counsel for Brown also failed to comply with local rules on summary judgment in opposing that motion. Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). A repeated failure to comply with the rule undermines this objective and needlessly expends the judiciary's resources. Counsel is admonished to strictly adhere to Local Rule 56.1 going forward.

[4] Brown objects to hearsay use by Local 241, *see* [125] at 11, but unlike Local 241, Brown does not specify what inadmissible statements he is referring to. In the same vein, Brown does not attempt to defend his use of hearsay (e.g., by pointing the Court to a potentially applicable exception under Fed. R. Evid. 803). The Court will not turn a blind eye to patently inadmissible material. Nor will it exclude evidence that is clearly admissible under an obvious exception to the hearsay rule. At the same time, it is not this Court's job to craft legal arguments for a party. *See Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 689 (7th Cir. 2014).

4

Local 241 are different parties, any statements by CTA employees are not admissible against Local 241 under the Rule 801(d)(2) exclusion for opposing party statements. [135] at 13. Hill's alleged statements to Naranjo are thus inadmissible.

Brown similarly relies on Middleton's deposition to establish that Hill made certain statements on social media. [135] at 13; [136] ¶ 13. But because Middleton's deposition testimony is relied upon to establish the truth of what Hill said, and because Local 241 and CTA are different parties, this is again inadmissible hearsay. Hill's alleged social media statements as related via Middleton's deposition are thus also inadmissible.

## III. Background

Unless noted, all facts recounted below are undisputed either because the parties agree or, as just discussed, because Brown failed to properly cite evidence refuting the fact asserted as required by Local Rule 56.1.

Brown, a transgender man, was employed as a bus operator by CTA from 2016 until his discharge on January 7, 2021. [126] ¶ 1.[5] As a bus operator, Brown was represented by Local 241. *Id.* ¶ 2. Brown initially worked out of the northside Chicago Avenue Garage, later moved to the Forest Glen Garage in March 2018, and was finally transferred to the 77th Street Garage in June 2020, where he worked at the time of his discharge. *Id.* ¶¶ 67, 78. Shortly after this transfer to 77th Street, Brown alleges that Hill told him that "all that bitchin you been doing ain't going to cut it

---

[5] In this opinion, citations to paragraph numbers in [126] refer to Brown's response to Local 241's 56.1 statement [112]. The Court addresses Brown's statement of additional material facts, [126] at 36–48, via Local 241's response [136].

down here. You're out south now." *Id.* ¶ 79. Hill recalls the details of the conversation differently but acknowledges the interaction and explains that his intent was to warn Brown that CTA customers on the southside are more likely to be aggressive with CTA operators. *Id.* ¶ 80.

### A.     Employee Wellness Fund

At some point after being hired—he does not specify when—Brown sought to use CTA's Employee Wellness Fund, which is available to CTA employees in emergency situations. [136] ¶ 2. As part of his effort to use the fund, Brown spoke to Hill. *Id.* Brown states that Hill "looked at him disgusted" and told him that "you are not going to get it." *Id.* But Brown subsequently applied for and received support from the Fund. *Id.* Neither party addresses whether Hill was aware at the time of this interaction that Brown is a transgender man.

### B.     Brown's Restroom Access

In July 2017, Brown—who had begun his medical transition but was not yet open to his coworkers about his gender identity—asked for clarification about CTA's restroom policy. [136] ¶ 3. He had begun "receiving funny looks in the women's restroom" but when he tried to use the men's restroom "other employees stared and froze." *Id.* Brown contacted his union representative Kelvin Gilkey, who told Brown that he had "heard about the issue" and referred him to CTA manager Middleton. *Id.* ¶¶ 3–4. Middleton told Brown that he did not know the bathroom policy, but Brown

was later informed by another CTA manager, Van Johnson, that he could use whatever bathroom he wanted. *Id.* ¶ 4.[6]

According to Middleton, Hill spoke to Middleton and compared Brown's situation to that of a person with a disability. [126] ¶ 70. Hill then stated that bus operators who were impaired or unable to perform their duties would be discharged or transferred to other roles by CTA. *Id.* Hill also told Middleton that he had more important things to do than advocating for a "confused person." [136] ¶ 6. For his part, Hill denies any awareness of Brown's issue accessing restrooms at this time. *Id.*

Gilkey, the union representative, told Middleton that Brown should be able to use the men's room because Brown "wanted to be a boy. He should use the boy's room." *Id.* ¶ 7. But Gilkey, a gay man, also told Middleton that transgender individuals like Brown were a "setback" for the LGBTQ community and argued that Brown was using alleged harassment from other CTA employees to distract from his work performance issues. *Id.*

### C. Gender-Affirming Care

In 2018, Brown approached union representative Donald Polk to inquire about insurance covered for a gender-affirming medical procedure that had been denied by his employee insurance plan. [136] ¶ 12. Polk told Brown that he did not think

---

[6] Brown's additional facts detail a conversation between Hill and Naranjo in which Hill allegedly used slurs and "really colorful language" in reference to Brown. *See* [136] ¶ 5. But as discussed, the portion of the Middleton deposition Brown relies on to support the alleged conversation between Hill and Naranjo is inadmissible hearsay. *See supra* at 4. Because Brown has not properly supported these factual allegations, he cannot rely on them at summary judgment. *See MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment.").

insurance would cover the procedure and that he did not think union officers would help Brown with the issue. *Id.* But, working with the American Civil Liberties Union, Brown successfully challenged CTA's denial of coverage for the procedure and obtained coverage. [126] ¶ 76. Brown did not file a grievance through Local 241 or seek Hill's assistance in obtaining health coverage for the procedures. *Id.* ¶ 77.

### D. Threats From Other CTA Employees

In April 2018 Brown called Gilkey and reported threats and harassment that Brown had received from other CTA employees after an argument on Facebook. [126] ¶ 71. According to Brown, the threats were issued in response to a post that did not pertain to his gender identity, but nonetheless disparaged Brown for not being loved, suggested Brown commit suicide, and that a coworker would "do it for him" if Brown was unable. [136] ¶ 9.[7]

Brown asked Gilkey to tell the employees to leave him alone. [126] ¶ 71. Gilkey asked Brown to text him the names of the employees at issue, which Brown did. [136] ¶ 11. Brown also contacted the CTA Equal Employment Office about the Facebook threats. [126] ¶ 72. Brown did not file a grievance with Local 241 based on these threats. *Id.* ¶ 73. Brown says this experience made him uncomfortable reporting experiences of mistreatment based on his gender identity to either CTA or Local 241. [136] ¶ 11.

---

[7] Local 241 object to Brown's reliance upon this document as "unauthenticated and lacking in foundation." [136] ¶ 9. But "evidence provided at the summary judgment stage need only be admissible in content, not necessarily in form." *Bowens v. Randle*, No. 10 C 2501, 2018 WL 3715728, at *4 (N.D. Ill. Aug. 3, 2018) (citing *Erickson v. Baxter Healthcare, Inc.*, 151 F.Supp.2d 952, 960 (N.D. Ill. 2001)); *see also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994).

### E.     FMLA Leave and Termination

On June 9, 2020, Brown applied for intermittent FMLA leave for back pain but CTA's third-party FMLA administrator requested that Brown obtain a second medical opinion. [126] ¶ 29. CTA took Brown "out-of-service without pay" on October 21, 2020, alleging that he had falsified his FMLA leave. *Id.* ¶ 30. Brown says that he was told by CTA management he had been recommended for termination but that CTA also wanted him to complete a third medical opinion. *Id.* ¶ 31.

Brown spoke with multiple Local 241 officials about keeping his job between October 21, 2020, and his eventual discharge on January 7, 2021, including Hill, union representatives Claudel Cain and Perry Thornton, and the union's First Vice President Woodrow Eiland. *Id.* ¶ 32.[8] Cain and Thornton attending meetings with CTA management on the issue with Brown and on his behalf. *Id.* ¶ 33.

The collective bargaining agreement requires CTA to impose discipline within 10 days of notifying the employee of an issue, but Local 241 and CTA often mutually agree to extend this period through what they term a Notice of Further Investigation ("NOFI"). *Id.* ¶ 18. On October 26 and 27, 2020, Brown asked Cain to obtain NOFIs on his behalf including for the purpose of obtaining a third medical opinion for his FMLA claim. *Id.* ¶¶ 34–35. Local 241 sought several NOFIs prior to Brown's termination. *Id.* ¶ 36. Brown sought but did not obtain a third medical opinion. *Id.*

---

[8] Brown objects to Local 241's citation to Hill's declaration in support of this statement of fact "as attempt[ing] to alter Keith Hill's deposition testimony." [126] ¶ 32. But Brown does not specify how the declaration does so. *Id.* (Brown makes the same objection, and similarly provides no additional argument, in several other instances as well.) The Court has reviewed the cited portion of the declaration and the excerpt of Hill's deposition to which Brown cites, *see* [126] ¶ 32, and sees no inconsistency.

¶ 37. Brown did not file a grievance with CTA before termination—or ask Local 241 to help him do so—but says he was not told this was an option. *Id.* ¶ 38. During the relevant time, it was Local 241's practice not to file or encourage union members to file grievances while employees were out of service pending investigation. *Id.* ¶ 21.[9]

On behalf of Brown and others who had been accused of falsifying FMLA leave, Hill requested a Last Chance Agreement ("LCA"), which is a formal settlement agreement between CTA, Local 241, and a union member where CTA agrees to a probationary period instead of termination. *Id.* ¶¶ 27, 39; [112-4] at 50–51, 55–56 (Hill deposition). CTA management refused an LCA for Brown. [126] ¶ 40. Brown received a discharge notice from CTA Senior Manager Arlana Johnson on January 7, 2021, stating the following:

> On October 20, 2020 CTA management discovered that between June 8, 2020 and October 20, 2020 you reported 24 FMLA absences to the 77th Steet Garage Management. Upon investigation it was found that you did not report these FMLA absences to The Reed Group, the third party administrator. Subsequently, the Reed Group denied the absences under FMLA. You incurred a serious Gross Misconduct/Behavioral violation when you provided false statements by claiming approved FMLA leave. Pursuant to the Corrective Action Guidelines, your actions constituted a gross misconduct violation warranting accelerated disciplinary action … Your actions were not in keeping with an efficient operation and contrary to the Authority's Mission. We therefore inform you that effective January 7, 2021 you are hereby discharged from employment with the Chicago Transit Authority.

*Id.* ¶ 42.

---

[9] Brown disputes that this was Local 241's usual practice on the grounds that "the statement [is] not supported by the evidence cited. [126] ¶ 21. But Local 241 cites Hill's declaration and deposition, both of which indicate this was the union's usual practice. *See* [112-14] at 61–62; [112-9] at 7–8. And Brown cites to no evidence that contradicts Hill's statements on the matter. Because Brown has "not controverted with specific citations to evidentiary material" Local 241's assertion this is their usual practice, the Court deems that fact admitted. N.D. Ill. L.R. 56.1(e)(3).

On January 12, Brown filed a grievance with CTA through Local 241, alleging he was wrongly discharged. *Id.* ¶ 43. The parties dispute whether a Local 241 vice president helped Brown prepare the grievance but agree that the union official submitted the grievance to CTA on his behalf. *Id.* Two days later, Hill, who did not know a grievance had been submitted, emailed Brown asking: "Can you come in or meet with your Rep to file a grievance that is your next step and you can add all your supporting information to the grievances." *Id.* ¶ 44.

After CTA denied Brown's grievance, Local 241 sent a letter signed by Hill to CTA requesting arbitration for Brown's grievance, along with 26 other grievances. *Id.* ¶ 45. Hill also attempted to resolve Brown's grievance at two pre-arbitration meetings in November 2021 and December 2021, though CTA continued to deny the grievance. *Id.* ¶ 46. Katherine Lunde, a manager with CTA Labor Relations, testified in a deposition that Hill told her that Brown had been "braggartly," saying that he was not working and that CTA could not do anything to him as a result of this. [136] ¶ 21. Hill denies that he said anything to Lunde or other CTA managers suggesting that Brown was not interested in following CTA rules or procedures, and further states that he believes Lunde "lied on him" with regard to a different matter and tries to avoid talking to her. *Id.*

Brown's grievance remains open and has not yet received a vote by the union membership on whether it will proceed to an arbitration hearing. [126] ¶¶ 48–49. Local 241 asserts this is because other pending discharge grievances predate Brown's,

while Brown contends that a membership vote is unnecessary to proceed to arbitration under Local 241's collective bargaining agreement. *Id.* ¶ 49.

As of January 2023, Local 241 had 184 open discharge grievances awaiting arbitration, and none that were filed after Brown's have proceeded to arbitration. *Id.* ¶¶ 50, 54. This includes the open discharge grievances of seven CTA employees who were terminated for FMLA falsification between April and December 2020, none of whom identify as transgender. *Id.* ¶ 53. Local 241 did not file a grievance for any of the seven until after they were discharged. *Id.* ¶ 56. Hill states that he intends to recommend that membership vote to approve sending Brown's grievance to an arbitration hearing. *Id.* ¶ 58. Local 241 also has filed a class-action grievance to challenge the FMLA-related suspension and discharge of multiple employes, including Brown. *Id.* ¶ 60. The class-action grievance was denied by CTA and remains in the arbitration process. *Id.*

### F. Title VII Action Procedural History

On April 21, 2021, Brown filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Local 241 alleging sex discrimination and retaliation. [126] ¶ 65. Brown received a right-to-sue letter and filed a timely complaint on February 7, 2022. [1]. Local 241 now moves for summary judgment. [110].

## IV. Analysis

Brown argues that Local 241 violated Title VII in two ways. First, he maintains that Local 241 discriminated against him because he is a transgender individual. [125] at 12–18; *see* 42 U.S.C. § 2000e-2(c) ("It shall be an unlawful employment

practice for a labor organization … to discriminate against, any individual because of his … sex"); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 660 (2020) ("[I]t is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex."). Second, he maintains that Local 241 retaliated against him for engaging in legally protected Title VII activity. [125] at 18–20; 42 U.S.C. § 2000e-3. The Court addresses each claim in turn.

### A. Sex Discrimination

For his sex-discrimination claim, Brown argues that Local 241 discriminated against him by refusing to help Brown with (1) access to the CTA's Employee Wellness Fund; (2) access to a gender-aligned restroom; (3) the threats from his coworkers; (4) CTA's coverage of his gender-affirming care; and, (5) getting CTA to fairly process his FMLA request or his related grievance. [125] at 13. But as the court previously assigned to this case noted, almost all of these incidents happened outside the 300-day window preceding Brown's April 30, 2021 EEOC charge. [34] at 5–6. And indeed, Brown has previously acknowledged that these untimely incidents are therefore not independently actionable. *Id.* at 5; [23] at 6–7. Thus, while the events prior to Brown's June 2020 FMLA leave request may be used to provide context—for example, as evidence of pretext—they cannot in themselves be the basis for Title VII liability. *Kellogg v. Ball State Univ.*, 984 F.3d 525, 530 (7th Cir. 2021); *see also E.E.O.C. v. Indiana Bell Tel. Co.*, 256 F.3d 516, 520 (7th Cir. 2001) ("Conduct more than 300 days before that charge cannot be reached under Title VII of the Civil Rights Act of 1964.").

That leaves Brown's FMLA requests and related grievance. For the purpose of the Title VII discrimination claim, the "singular question" faced by the Court is whether Brown has "introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's ... sex ... caused the discharge or other adverse employment action.'" *Igasaki v. Illinois Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)). An adverse employment action is "a materially adverse change in the terms and conditions of employment that is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (cleaned up). In the context of union representation, Brown must show that Local 241 has "discriminated in the performance of its agency function." *E.E.O.C. v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 659 (7th Cir. 2003); *see also Motley v. IAMAW Dist. Lodge 141*, 768 F. App'x 570, 573 (7th Cir. 2019) ("To stave off summary judgment, Motley needed to present evidence from which it could be inferred that the union refused to arbitrate his grievance because of his [protected status].").

Because CTA terminated Brown—not Local 241—the termination cannot be an adverse action for the purpose of Local 241's Title VII liability.[10] Instead, Brown argues that Local 241 "treated [Brown] differently when [it] refused to help [Brown] ... get[] CTA to fairly process his FMLA request" and "was inactive when [Brown]

---

[10] At an earlier stage in the proceedings, Brown argued that Local 241 worked with CTA to terminate him, making Brown's termination from CTA a plausible adverse employment action by Local 241 as well. [34] at 10. But Brown has not advanced this argument at the summary-judgment phase. *See generally* [125] at 13–14, 16.

sought help over his lengthy suspension" because "it never advised him he could grieve a suspension of over 30 days" under the collective bargaining agreement. [125] at 13, 16. As a result, Brown contends that a "reasonable jury could conclude [Local 241] discriminated against [Brown] in performing its union functions." *Id.* at 16.

But Brown has not presented evidence that he was treated differently from other CTA employees in similar circumstances, let alone treated less favorably based on his gender identity. Brown lists his evidence as the following:

> We [] know that LCAs were given to some employees. We also know that the Union has been able to get members reinstated following their discharge during this time. We also know that only 26 cases remain in limbo, and Plaintiff's is one of them." We also know that of the cases at the 77th street garage, Plaintiff was the only one with a pending FMLA request when charged with the discipline.

[125] at 18. Brown argues that "[t]he above supports a reasonable inference of disparate treatment, and summary judgment should be denied." *Id.*

But it is not reasonable to infer disparate treatment from these facts. Local 241 has presented undisputed evidence that it sought an LCA on Brown's behalf and that CTA has the final decision about whether to agree to an LCA. [126] ¶¶ 28, 39. Brown has not explained how CTA's decision to grant LCAs to some union members but not Brown could be attributed to Local 241. So the fact that other union members received LCAs while Brown did not is not evidence of disparate treatment of Brown by Local 241.

Likewise, that Brown is one of 26 union members whose discharge grievances "remain in limbo" is not evidence that he is being treated differently than other union members; it is evidence he is being treated just like 26 other union members. And

15

Brown does not explain how the disposition of other grievances at the 77th Street Garage are relevant to his claim. For example, Local 241 has provided undisputed evidence that no discharge grievance after Brown's has been sent to arbitration before his own, *see* [126] ¶ 50, so it is not reasonable to infer that cisgender union members are being prioritized.

It is also not reasonable to infer that the union "was inactive" during Brown's disciplinary process. Local 241 officials attended meetings with management on Brown's behalf, sought and obtained NOFIs to allow him to seek a third medical opinion, and sought an LCA to allow Brown to remain employed at CTA. And whether or not Local 241 should have affirmatively told Brown that he could initiate the grievance process while he was being investigated is beside the point. There is no genuine dispute of material fact that it was Local 241's practice not to file or encourage the filing of grievances during that period, *see supra* at 10 and n.9, and Brown has presented no evidence that would allow a fact-finder to infer that other union members were treated differently in this regard. In any event, Brown has also presented no evidence that filing a grievance during his out-of-service period would have made a difference, so his sex discrimination claim fails for that reason as well. *See Allen v. Unite Here Local 1*, 628 F. Supp. 3d 797, 806 (N.D. Ill. 2022) (union member "does need to show that the action taken (or not taken) by the union would have been reasonably likely to prevent the harassment from occurring.") (citing *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011)).

16

Because Brown has not created a genuine dispute of material fact about whether he was treated differently than other union members—including, a genuine dispute of material fact as to whether there was an "employment action" at all by Local 241, *see Poullard v. McDonald*, 829 F.3d 844, 855 (7th Cir. 2016) ("a successful disparate treatment claim requires some materially adverse employment action")—the Court need not reach the issue of whether Local 241's alleged actions were materially adverse or motivated by Brown's gender identity.

## B.    Retaliation

Brown's retaliation claim fails for similar reasons. To prove retaliation under Title VII, Brown must show that he (1) engaged in a protected activity, (2) was subject to a materially adverse action, and (3) a causal link exists between the protected activity and the adverse action. *See Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). An action is materially adverse when it would dissuade a reasonable employee from engaging in the protected activity. *Id.* at 696.

Brown meets the first prong. Brown argues that the relevant protected activities were his advocacy for gender-appropriate bathroom use in 2017 and his successful campaign with the ACLU for insurance coverage of his gender-affirming surgery in 2018. [125] at 19. Local 241 does not dispute that these activities are protected under Title VII, and Brown has fairly characterized them as "some step[s] in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017).

But Brown's retaliation claim runs aground on the next two prongs. First, Brown argues that the adverse actions he suffered were Local 241's "fail[ure] to

17

inform [Brown] that he had a right to grieve his suspension after 30 days" and "Hill expressly disparaging [Brown] to [CTA Manager] Lunde at Labor Relations, killing any chances he would have had at a LCA or at overcoming the charge of discipline altogether and securing a third medical opinion." [125] at 19. But, as already discussed, Brown provides no evidence that Local 241 affirmatively informed *any* union members of their ability to grieve before their disciplinary process was resolved. And, indeed, Local 241 later submitted a grievance on Brown's behalf, and included him in a class-wide grievance. Put another way, there is no genuine dispute of material fact that Local 241 treated Brown identically to other union members in terms of informing him of his rights and initiating a grievance. And the Court does not see how identical treatment could dissuade a reasonable employee from a protected activity.

Next, even if the Court were to accept for the sake of argument that Hill's conversation with Lunde constituted an adverse action, Brown has also not established a causal connection between any protected activity and that conversation. The protected activity Brown relies on occurred more than two years before Hill's conversation with Lunde, which means a factfinder cannot reasonably infer a causal connection from the timing. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (47-day gap between protected activity and adverse action did not allow inference of causation).

Brown argues that Hill's alleged June 2020 comment to Brown about Brown's "bitchin" demonstrates that Hill's conversation with Lunde was connected to his

18

earlier protected activity. [125] at 19–20. But again, this comment occurred months before the conversation with Lunde, and Brown points to no evidence that could demonstrate "some nexus" between Hill's "stray remark" and the conversation with Lunde. *See Scaife v. Cook Cnty.*, 446 F.3d 735, 741 (7th Cir. 2006) ("When a plaintiff offers an employer's stray remark in a discrimination case, it is necessary to demonstrate "some nexus" between the remark and the challenged employment decision."*), overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). Brown has thus not established the required "causal link" between his protected activity and the alleged adverse action.

## IV. Conclusion

For the foregoing reasons, Local 241's motion for summary judgment [111] is granted. Because the Court also grants CTA's motion for summary judgment [115], for the reasons set forth in a separate memorandum opinion and order issued on this date, this civil case is terminated.

Georgia N. Alexakis
United States District Judge

Date: 3/31/25