UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RUSSIA BROWN,<br><br>        Plaintiff,<br><br>     v.<br><br>CHICAGO TRANSIT AUTHORITY and<br>AMALGAMATED TRANSIT UNION LOCAL<br>241<br><br>        Defendants. | No. 22 CV 675<br><br>Judge Georgia N. Alexakis |

MEMORANDUM OPINION AND ORDER

Plaintiff Russia Brown, a former bus operator for the Chicago Transit
Authority ("CTA") was terminated after CTA concluded that he falsified leave. Brown
sued CTA for violating 42 U.S.C. § 1983 and the Family and Medical Leave Act
("FMLA"), 29 U.S.C. § 2601 *et seq.*, and sued both CTA and his union, Amalgamated
Transit Union Local 241 ("Local 241"), for unlawful discrimination on the basis of his
gender identity in violation of Title VII of the Civil Rights Act of 1964. CTA now
moves for summary judgment. [115]. For the reasons given below, that motion is
granted.[1]

## I.  Legal Standards

Summary judgment is appropriate if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014);

---

[1] The Court addresses Local 241's motion for summary judgment in a separate memorandum
opinion and order issued this same day.

Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.     Compliance with Local Rule 56.1

In its memorandum opinion and order on Local 241's motion for summary judgment, the Court provided an overview of the local rules on summary judgment. The Court incorporates that overview by reference here.

CTA argues that Brown's Rule 56.1 response and Brown's statement of additional facts fail to provide proper support for certain facts and fail to comply with Local Rule 56.1(d)(1)'s requirement that any facts asserted "consist of concise numbered paragraphs." *See* N.D. Ill. L.R. 56.1(d); [129] (which reflects both Brown's Rule 56.1 response and Brown's statement of additional facts); [137] at 2–5; [138]. The Court agrees that Brown's submissions suffer from these violations. And, as the Court notes in its accompanying memorandum opinion, counsel for Brown committed similar violations when opposing Local 241's motion for summary judgment.

On several occasions in this matter, Brown points to an entire deposition or up to 20 pages of a deposition without providing a more precise citation, *see, e.g.*, [129] at 4–6, 30–31, ¶¶ 9, 10, 11, 53, or fails to properly support certain facts with citations to any record evidence at all, *see, e.g.*, *id.* at 2–4, 38–39, ¶¶ 3–4, 7, 63. But "[a] court should not be expected to review a lengthy record for facts that a party could have

easily identified with greater particularity." *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).

On other occasions, Brown attempts to support asserted facts with inapposite record cites or citations that fall short of actually disputing the asserted fact. *See, e.g.*, [129] at 29, ¶ 51 (Brown disputes he received a letter, but in the cited portion of the deposition, he discussed the contents of the letter and then testified only that he could not recall receiving it); 55, ¶ 18 (Brown asserts that "[m]anagers were supposed to report FMLA absences reported to the garage to the third party administrator on a weekly basis," but in the cited portion of the record, a former CTA manager testified only that he "believe[d]" that CTA management communicated with the administrator weekly, but he "wasn't privy to that" and "couldn't say for certain").

On still other occasions, Brown objects that CTA's factual statements "lack[] foundation" or are "self-serving," without providing legal support to justify a dispute. *See, e.g., id.* at 28–29, 42, 44–45, ¶¶ 50, 51, 69, 73; *see Hill v. Tangherlini,* 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."); *Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 960 (N.D. Ill. 2001) (lack of foundation is not generally a bar to considering evidence at summary judgment).

The Court is entitled to insist on "strict compliance" with the local rules. *Cracco v. Vitran Express, Inc.,* 559 F.3d 625, 623 (7th Cir. 2009) (cleaned up); *see also Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3d 626, 630 (7th Cir. 2010). ("[A]

3

district court may strictly enforce compliance with its local rules regarding summary judgment motions."). Where Brown has failed to comply with these rules—and, in particular, where Brown has failed to support facts with on-the-mark record evidence—the Court will treat properly asserted and supported facts in CTA's filings as undisputed for the purpose of summary judgment. *See* Fed. R. Civ. P. 56(e)(2); N.D. Ill. L.R. 56.1(e)(3).

## III.   Background

Unless noted, all facts recounted below are undisputed either because the parties agree or, as discussed above, because Brown failed to cite evidence refuting the fact asserted as required by Local Rule 56.1.[2]

### A. Brown's Employment History at CTA

Brown, a transgender man, began working for CTA as a bus operator in 2016. [117] ¶¶ 2, 21. Three events in Brown's employment history with CTA are relevant to this matter's resolution.

First, in 2017, "as he began to appear more masculine during his physical gender transition," Brown's "experience became awkward in both the men's and

---

[2] Neither party provided a factual recitation in their memoranda supporting or opposing summary judgment. Both instead referred the Court to their statements of fact. [116] at 2; [128] at 1. "[I]t is inappropriate in one's memo to simply refer the Court to the 56.1 statement." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). These statements "do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum." *Id*. In resolving CTA's motion, therefore, the Court considers only those portions of the Local Rule 56.1 fact statements that the parties cite in their briefs. *See Landry v. Abbott Lab'ys*, No. 17 CV 8499, 2020 WL 1848209, at *4 (N.D. Ill. Apr. 13, 2020) (using this approach in similar circumstances); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes.").

women's bathrooms." *Id.* ¶ 21. Brown asked his manager (Gregory Middleton) about CTA's bathroom policies, and Middleton, in turn, referred the question to Van Johnson of CTA's Equal Employment Opportunity Unit ("EEO"). *Id.* Johnson told Brown to use the bathroom of his preference, and Brown's management told him that he could also use the gender-neutral clerk's bathroom. *Id.*

Second, in 2018, Brown alleged to Van Johnson that two other CTA employees, using Facebook, had harassed and threatened him based on his gender identity. *Id.* ¶ 26. Because the matter concerned union members, Johnson referred the investigation to Local 241. *Id.* ¶ 27.

Third, also in 2018, Brown sought gender-affirming surgery. *Id.* ¶ 33. CTA's health insurer initially denied coverage for the surgery, as it was not covered by CTA's plan. *Id.* Brown engaged the American Civil Liberties Union ("ACLU"). *Id.* The ACLU wrote a letter to CTA requesting coverage for gender-affirming surgery. *Id.* CTA replied 16 days later, stating that it would "add gender confirmation surgery to the services its medical insurance covers and has so directed … CTA's third-party administrator, to revise its plan accordingly." *Id.* ¶ 34. Brown received the surgery in 2019. *Id.* ¶ 36.

## B. Brown's Application for FMLA Leave

### 1. CTA's FMLA Application Process

CTA manages its FMLA application process through its third-party administrator ("TPA"), ReedGroup. *Id.* ¶ 43. Its process aligns with the process outlined in 29 C.F.R. § 825.307.

5

Under that process, a CTA employee first requests FMLA leave through ReedGroup, and if the employee meets the eligibility criteria for FMLA leave, ReedGroup asks the employee to provide a medical certification. *Id.* ¶ 41. If ReedGroup doubts the validity of the medical certification, it may require the employee to obtain a second opinion at a health care provider it designates. *Id.* ¶ 45; *see also* 29 C.F.R. § 825.307(b) ("An employer who has reason to doubt the validity of a medical certification may require the employee to obtain a second opinion at the employer's expense …. The employer is permitted to designate the health care provider to furnish the second opinion.").

If the first and second medical opinions differ, ReedGroup may require the employee to obtain a certification from a third health care provider. *Id.* ¶¶ 48, 50.[3] ReedGroup uses a vendor, MLS, to set up second and third opinion appointments. *Id.* ¶ 46. If the employee does not cooperate in this process, ReedGroup relies on the second opinion. *Id.* ¶ 52; *see also* 29 C.F.R. 825.307(c) ("The employer and the employee must each act in good faith to attempt to reach agreement on whom to select for the third opinion provider ... If the employee does not attempt in good faith to reach agreement, the employee will be bound by the second certification.").

### 2. Brown's Application and Denial

Brown applied for intermittent FMLA leave in June 2020 for back pain. [117] ¶ 41. ReedGroup sent a letter to Brown acknowledging his FMLA request, stating

---

[3] Brown disputes that the decision to require a third medical opinion is in the hands of the ReedGroup, [129] ¶ 48, but the deposition pages he cites to justify the dispute say otherwise. *See* [130-1] at 31:14–17 (Q: "But who makes the determination as to whether to move forward with a third opinion?" A: "The final decision is ReedGroup in this case.").

that he met the eligibility requirements for FMLA leave, and requesting that Brown send a medical certification. *Id.* Brown received a medical certification from a chiropractor, Dr. Gary Ogurkiewicz. *Id.* ¶ 44. Because Dr. Ogurkiewicz often opines outside of his specialty, and because he submits medical certifications to CTA with unusual frequency, ReedGroup sends all employees who submit medical certifications from Dr. Ogurkiewicz for second opinions. *Id.* ¶ 45.

MLS sent Brown to Dr. Christopher Bergin for a second opinion. *Id.* ¶ 46. Dr. Bergin found that Brown was not medically qualified for FMLA because Brown did not provide him with medical records and because no objective findings supported Brown's subjective complaints. *Id.*

Because Dr. Bergin's opinion differed from Dr. Ogurkiewicz's, Brown was offered the opportunity to schedule a third opinion. *Id.* ¶ 50. ReedGroup's vendor, MLS, sent Brown a letter via FedEx with instructions on how to proceed with his third opinion appointment and called Brown to schedule the appointment. *Id.* ¶¶ 50, 51. Brown did not respond to MLS. *Id.* ¶ 52. Because Brown did not respond to the attempts to schedule a third opinion appointment, ReedGroup relied on the second opinion of Dr. Bergin. *Id.* ¶ 54. Brown's FMLA request was denied on December 11, 2020. *Id.*

## C. Brown's Termination

### 1. CTA's FMLA Leave Call-Out Process

CTA uses a TPA to track each CTA employee's FMLA hours. *Id.* ¶ 10. Each time an employee calls out on FMLA leave, the TPA deducts those hours from the

employee's total available FMLA hours. *Id.* So if an employee with intermittent FMLA leave needs to call out, the employee first calls the TPA to report that they are calling out on FMLA leave and then notifies their work location that they have called out on FMLA leave for that day. *Id.* ¶ 57. If an employee does not abide by this process and calls their work location without also calling the TPA, the employee's available FMLA balance is not properly reduced. *Id.* ¶ 60.[4] This call-out process was the same regardless of the particular TPA that CTA worked with at a given time. *Id.* ¶ 57. The TPA during the timeframe relevant to this matter was ReedGroup. *Id.* ¶ 10.

CTA employees are told they must request FMLA leave through the TPA before reporting to their work location that they are calling out. *Id.* ¶ 58. CTA considers it to be falsification when an employee calls their work location and report that he is calling out on FMLA leave without notifying the TPA. *Id.* ¶ 59. Per CTA's Corrective Action Guidelines, falsification is grounds for discharge. *Id.* ¶¶ 14, 15.

### 2. Brown's Noncompliance with the FMLA Leave Call-Out Process

Brown used FMLA leave before the incident here, for a condition unrelated to his back pain. *Id.* ¶ 65. When using FMLA leave previously, Brown called the TPA to call out on FMLA leave before then calling out with his workplace. *Id.*

Around October 21, 2020, CTA Business Manager Wilmer DeJesus checked Brown's FMLA call-outs with his work location against the FMLA leave requests he had made to ReedGroup. *Id.* ¶ 63. DeJesus found that, between June and October 2020, Brown called out on FMLA leave with his work location 24 times without also

---

[4] The Court addresses Brown's efforts to dispute this factual assertion, as well as the factual assertion in the sentence that immediately follows, at greater length later in this opinion.

calling out with ReedGroup. *Id.* DeJesus then printed Brown's most recent document in the ReedGroup mailbox, which was an unrelated document from Brown's previous FMLA leave. *Id.* ¶¶ 63–64. Atop this document, DeJesus handwrote all of the dates that Brown called out on FMLA leave with his work location, without also calling out with ReedGroup. *Id.* ¶ 64.

DeJesus interviewed Brown on October 22, 2020. *Id.* ¶ 69. When asked why he failed to call ReedGroup when taking FMLA leave, Brown could not offer an explanation. *Id.* DeJesus referred Brown to CTA Senior Manager Arlana Johnson to be considered for discharge based on falsification. *Id.* After DeJesus was transferred to a different garage, another CTA manager, Alisha Latham-Hill, drafted a recommendation for Brown's discharge and submitted it to Arlana Johnson. *Id.* ¶¶ 73–74.

On January 7, 2021, after reviewing DeJesus' and Latham-Hill's findings, Arlana Johnson discharged Brown for falsification. *Id.* ¶ 76. Around this same time, four other operators from Brown's garage, who had called out on FMLA leave with their work location without also calling out with the TPA, were also discharged for FMLA falsification. *Id.* ¶ 77.

## IV.  Analysis

### A. Brown's Title VII Sex Discrimination Claim

To establish a prima facie case of discrimination, Brown must present evidence from which a reasonable jury could find that: (1) he belongs to a protected class; (2) he met CTA's legitimate expectations; (3) he suffered an adverse employment action;

and (4) another similarly situated employee who was not in his protected class was treated better by CTA. *See Marshall v. Indiana Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). If Brown makes this prima facie showing, the burden of production then shifts to CTA to state a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 792. After that, the burden shifts back to Brown to present evidence that the stated reason is a pretext for discrimination. *Id.*

CTA and Brown both used the *McDonnell Douglas* framework to organize their arguments, and the Court employs that framework as well. In applying the above framework to Brown's claims, the Court recognizes that it should consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016); *see also Reives v. Illinois State Police,* 29 F.4th 887, 892 (7th Cir. 2022) (the *McDonnell Douglas* framework is consistent with *Ortiz* and remains an efficient way to assess evidence in discrimination cases). The ultimate question is whether, based on the evidence presented, a reasonable jury could conclude that Brown's gender identity caused CTA to dismiss him. *Ortiz,* 834 F.3d at 765.

For purposes of his prima facie case, CTA does not dispute that Brown (1) is a member of a protected class because of his gender identity,[5] and (3) suffered an

---

[5] *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer … to discharge any individual … because of such individual's race, color, religion, sex, or national origin."); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 660 (2020) ("[I]t is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex.").

adverse employment action when he was discharged. [116] at 4. The Court therefore must assess whether a genuine dispute of material fact remains that would permit a reasonable jury to conclude that (2) Brown met CTA's legitimate expectations, and (4) another similarly situated employee not in Brown's protected class (i.e., a cisgender employee) was treated better by CTA. As the Court explains next, the answer to both those questions is "no," and so it grants CTA's motion for summary judgment on Brown's Title VII discrimination claim.

### 1. Brown Did Not Meet CTA's Legitimate Expectations.

Because Brown falsified his FMLA leave on 24 occasions before he was discharged, he cannot show that he met CTA's legitimate expectations.

Brown does not dispute that he called out on FMLA leave with his work location on 24 occasions without also calling out with ReedGroup. [128] at 1–2. He instead argues that his failure to call out with ReedGroup was an honest mistake because, Brown maintains, ReedGroup had a different call-out procedure than CTA's former TPA, Sedgwick. *Id.* at 2–3. Brown describes these different procedures at some length: He details how Sedgwick and ReedGroup handled "Claim ID Numbers" differently and how these differences caused "administrative confusion," which left Brown convinced that he was properly calling out of work with ReedGroup. *Id.*

The Court understands Brown's position, but the problem lies in his lack of evidentiary support for it. To advance his position, Brown cites his responses to three of CTA's statement of facts: [129] ¶¶ 57, 62, and 67. *See* [128] at 2–3. All three responses cite exclusively to the same source: pages 54 through 56 of Brown's May

2023 deposition. But Brown's cited-to testimony does not support the assertion that any difference actually existed between Sedgwick's and ReedGroup's call-out policies. *See* [112-11] at 54–56.[6] Instead, Brown simply testifies to the fact that, when he called out of work when Sedgwick was the TPA, he would call both Sedgewick and his work location. *Id.* When he called out of work when ReedGroup was the TPA, he would call only his work location. *Id.* Absent from this testimony is any indication that Brown believed he was adhering to ReedGroup's procedures or that he was otherwise confused by ReedGroup's procedures. Nor does his deposition testimony support his underlying contention: that Sedgwick and ReedGroup had different call-out procedures in place.

In short: the very record material Brown cites shows that Brown failed to call ReedGroup when calling out on FMLA leave, which is the very reason CTA terminated him. [117] ¶¶ 65, 68; *see also id.* ¶ 72 (Brown had previously called the TPA to report his FMLA leave, as required, thus demonstrating to DeJesus that Brown knew the proper FMLA reporting polices but still failed to abide by them on 24 occasions).

Brown also focuses his attention on a supposed requirement that CTA managers reconcile FMLA absences with ReedGroup every week. [128] at 3–4. As the Court understands Brown's claim: CTA required its managers to reconcile FMLA absences with ReedGroup on a weekly basis; manager DeJesus failed to conduct these required weekly audits; CTA knew of DeJesus' failure; CTA did not punish DeJesus;

---

[6] These page numbers refer to the page numbers of Brown's deposition transcript.

and this "selective enforcement" establishes that Brown's firing was a pretext for discrimination against Brown based on his gender identity. *Id.* Brown's contention, however, suffers from another failure of proof.

To support his assertion that CTA managers were required to reconcile FMLA absences with ReedGroup every week, Brown cites his responses to CTA's statements of fact at ¶ 60 and ¶ 63 and his additional statements of facts at ¶ 18. [128] at 3–4. Brown's response to ¶ 63, however, cites no record material at all. *See* [129] at 39, ¶ 63. Brown's response to ¶ 60 and his additional statement of fact at ¶ 18 both cite, in relevant part, pages 114 through 116 of the deposition of Gregory Middleton, who was a former manager of Brown's. [129] at 36, 55, ¶¶ 60, 18. There, Brown's counsel asked Middleton whether "CTA management" relayed or communicated information about an employee taking FMLA leave to a TPA on a weekly basis. [112-19] at 116. Middleton responded: "I believe so, yes," *see id.* at lines 12–14, but when asked for further details, continued: "It wouldn't have been a procedure that I would've followed. It would've been one that our lead management department would've implemented. And I—I wasn't privy to that so I—I couldn't say for certain." *Id.* at lines 18–21.

In other words: the only factual support Brown offers for the premise that CTA required its managers to reconcile FMLA absences with ReedGroup on a weekly basis is testimony from a manager who "believe[d]" that CTA management communicated with the TPA on a weekly basis, but that he could not say for certain because he did not participate in that process. *Id.* From this exceedingly thin testimony, no

13

reasonable juror could conclude that under CTA policy, managers were required to reconcile FMLA absences with ReedGroup every week, let alone further conclude that because DeJesus purportedly failed to follow this policy and because CTA purportedly failed to reprimand DeJesus for his noncompliance, CTA discriminated against Brown based on his gender identity.

Indeed, Brown cites no record material to support his assertion that, even if such a policy existed, DeJesus failed to comply with it. In his additional statements of fact, Brown writes that "DeJesus did not do this"—meaning, "report FMLA absences reported to the garage to the third party administrator on a weekly basis"— "with Plaintiff." [129] at 55, ¶ 18. To support this statement, Brown cites the same pages from Middleton's deposition that the Court has just discussed and three lines from DeJesus' deposition. *Id.* (citing [112-13] at 72:17–19). But in those lines of DeJesus' deposition, DeJesus has been asked whether "the majority of [disciplinary processes are] resolved in less than 30 days," and DeJesus responds: "[I]f I had to speculate, yes." [112-13] at 72. The cited portion of DeJesus' testimony has nothing to do with ReedGroup or DeJesus' compliance with a CTA policy involving TPAs.

Still, Brown insists that because the grounds for his termination were pretextual, CTA cannot rely on his failure to follow proper FMLA leave call-out procedures as proof that he was not meeting expectations. [128] at 2. But "[w]hen evaluating a plaintiff's evidence of pretext … the only question is whether the employer's proffered reason was a lie." *Parker v. Brooks Life Sci., Inc.,* 39 F.4th 931, 937–38 (7th Cir. 2022) (cleaned up). "[I]t is not the court's concern that an employer

14

may be wrong about its employee's performance, or be too hard on its employee." *Id.* at 938. To meet this burden at summary judgment, Brown "must identify weaknesses, implausibilities, inconsistencies, or contradictions in [CTA's] asserted reasons that a reasonable person could find it unworthy of credence." *Id.*

For the reasons outlined above—namely, the Court's inability to credit Brown's assertions that he complied with call-out procedures, that he was confused about what procedures to follow, and that DeJesus was somehow at fault for Brown's failure to comply—Brown has not met this burden. Instead, the record material, without any genuine factual dispute, supports CTA's position that it terminated Brown because he failed to meet his employer's expectations when he engaged in FMLA falsification. And although Brown spends much time and energy trying to show that various CTA employees and Local 241 members were aware of his gender identity beginning in 2017 and 2018, *see* [128] at 7–8, he establishes no link between that awareness and his termination for FMLA falsification more than approximately three years later.[7]

---

[7] The majority of the statements of fact Brown references on pages 7–9 of [128] are either supported exclusively by hearsay, *see, e.g.,* [129] at 50–54, ¶¶ 3–8, 13, or are unsupported by the cited record, *see, e.g.,* [128] at 8 (Brown claims that "the ACLU forced CTA to cover gender-confirming surgery," but per the cited portion of the record, the ACLU wrote a letter to CTA requesting it cover gender-affirming surgery, and 16 days later, CTA responded that its health insurer began covering gender-affirming surgery); 8–9 (Brown alleges that he "received death threats," that CTA's EEO "sent an email to the union noting that the coworkers bullied and discriminated against plaintiff based on his gender," but that the EEO "did not interview any of the individuals involved"; and yet the cited portion of the record shows only that the email the EEO sent noted that Brown had "alleged" bullying and discrimination based on his gender and that the EEO did not recall whether he interviewed the individuals involved). The Court therefore cannot accept these assertions as true. *See, e.g.,* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). In any event, the veracity of these facts is immaterial to the resolution of this claim.

At bottom, Brown has not shown evidence from which a reasonable jury could find that he met CTA's legitimate expectations. Although the Court could grant CTA summary judgment on Brown's Title VII discrimination claim on this basis alone, in the interest of evaluating Brown's claim "as a whole," *Ortiz,* 834 F.3d at 765, it will also address the lack of evidence that another similarly situated employee who was not in Brown's protected class was treated better by CTA.

### 2. Brown Has Not Identified a Comparator.

To survive summary judgment, Brown must identify a comparator, outside of his protected class but like him in all other material respects, who engaged in similar conduct as him, but who CTA treated differently. *See Anderson v. Street,* 104 F.4th 646, 653 (7th Cir. 2024) (plaintiff must at least show that the comparator had the same supervisor, was subject to the same standards, and engaged in similar conduct); *see also Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (summary judgment is appropriate when no reasonable fact-finder could find that plaintiffs have met their burden on the issue).

Brown misunderstands that the burden of identifying a comparator is on *him,* not CTA. Instead of presenting his own comparator, he argues that CTA's four comparators—all operators from Brown's garage who, like Brown, were fired for FMLA falsification—differed from Brown materially because they "all demonstrated a deliberate attempt to deceive." [128] at 6. The Court need not attempt to dissect this argument because CTA's production of a suitable comparator is not at issue here:

16

*Brown* must present a comparator who was treated better than him despite engaging in similar conduct.

The closest Brown comes to meeting this burden is in a footnote. Brown offers that "Operator Winston A. Johnson took FMLA leave without calling ReedGroup or receiving a Claim ID Number but received a last chance agreement." [128] at 5 n.3.[8] To support this assertion, Brown cites "PSOF ¶ 95." But there is no "PSOF ¶ 95," as Brown has 39 statements of fact, and CTA has 80. *See generally* [129]. Even after digging through Brown's statement of facts, the Court cannot find any that mention "Operator Winston A. Johnson." The closest match is Brown's 37th statement of fact, which mentions that "Alisha Latham-Hill issued a last chance agreement for Operator Winston." [129] at 60, ¶ 37. This paragraph does not describe who Operator Winston is, how he or she compares to Brown, or why he or she received a last chance agreement.

Because Brown provides no factual support from which a reasonable jury could conclude that "Operator Winston A. Johnson" was cisgender but similar to Brown in all other material respects and engaged in similar misconduct, Brown has failed to shoulder his burden of identifying a comparator. For this reason, and because Brown otherwise has failed to adduce any admissible and supported evidence that he was dismissed because of his gender identity, *Ortiz,* 834 F.3d at 765, the Court grants summary judgment to CTA on Brown's Title VII discrimination claim.

---

[8] As the Court explains in the accompanying memorandum opinion and order on Local 241's motion for summary judgment, a last chance agreement is a formal settlement agreement between CTA, Local 241, and a union member where CTA agrees to a probationary period instead of termination.

### B. Brown's Title VII Retaliation Claim

To survive summary judgment on his Title VII retaliation claim, Brown must present evidence from which a reasonable jury could reasonably infer that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two. *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 608 (7th Cir. 2022).

With respect to the first factor, Brown alleges that he engaged in three instances of protected activity. [128] at 7–9. CTA does not dispute that these activities constitute cognizable protected activities, so for purposes of this motion, the Court assumes they do. The first instance occurred in 2017, when Brown inquired about CTA's bathroom policy. [117] ¶ 21. The second instance occurred in 2018, when Brown reported to the EEO that other CTA employees harassed and threatened him on Facebook. [129] at 52, ¶ 10. The third instance also occurred in 2018, when Brown (with assistance from the ACLU) sent a letter to CTA, urging it to cover gender-affirming surgery through its health insurance provider. [117] ¶ 33.[9]

With respect to the second factor, Brown was terminated, which clearly constitutes a materially adverse employment action. *See Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 696 (7th Cir. 2017) (an action is materially

---

[9] Brown alleges that he again engaged in protected activity in 2019 "when he acted on those healthcare accommodations [for gender-affirming surgery] and was in the process of engaging another round of treatment that would have also been protected." [128] at 12. He cites numerous statements of fact, but none supports his allegation that in 2019, he "was in the process of engaging another round of treatment that would have also been protected." The Court thus disregards this assertion.

adverse when it would dissuade a reasonable employee from engaging in the protected activity).

That leaves the third requirement. To show a causal connection, Brown must offer evidence that a retaliatory motive was a "but-for cause of the challenged employment action." *Lesiv v. Illinois Cent. R.R. Co.,* 39 F.4th 903, 915 (7th Cir. 2022). As part of this evidence, Brown must show that the individual who decided to dismiss him actually knew of his protected activity. *Id.* It is not enough that the decisionmaker could or should have known about the protected activity. *Id.*

CTA dismissed Brown on January 7, 2021. [117] ¶ 76. Senior Manager Arlana Johnson decided to dismiss Brown after she reviewed investigatory findings by Managers Dejesus and Latham-Hill. *Id.*[10] Johnson was not aware of Brown's 2017

---

[10] Brown disputes that Johnson was the sole decisionmaker, but provides no factual support to rationalize his dispute. [129] at 46–47, ¶ 76. The Court therefore treats ¶ 76 as admitted.

bathroom-policy inquiry, his 2018 report to the EEO, or his 2018 letter. *Id.* ¶ 79.[11]
That the decisionmaker responsible for Brown's discharge was unaware of his
protected activity alone defeats his Title VII retaliation claim.

Undeterred, Brown argues that his Title VII retaliation claim should go to a
jury because "there were too many decisionmakers involved in the termination
process to make that determination at summary judgment." [128] at 10. He adds:
"Especially when certain individuals involved did know." *Id.* Who these "many
decisionmakers" or "certain [involved] individuals" were, Brown does not specify.
What they "did know," Brown also does not say. Perhaps most confoundingly, the
portion of Brown's opposition brief addressing his Title VII retaliation claim never
even mentions Arlana Johnson—the undisputed decisionmaker. Ultimately, Brown
asks the Court to speculate that because "[p]eople are social animals," other CTA
employees must have "shared this important context." [128] at 10. But "[s]peculation

---

[11]   Brown does not cite CTA's statements of fact ¶ 76 or ¶ 79 in his response brief. *See
generally* [128]. However, for the sake of thoroughness: In his response to CTA's statement
of fact ¶ 79, Brown disputes that Senior Manager Johnson was unaware of his 2018 advocacy
with the ACLU because it was "widespread through CTA." [129] ¶ 79. To support his
assertion that "[n]ews about Plaintiff's advocacy with the ACLU to get gender affirming care
was widespread through CTA," Brown cites three deposition transcripts: 12 pages of
testimony from Middleton, Brown's one-time manager, who testified that he became aware
of Brown's ACLU advocacy *after he left CTA* through an article in the Chicago Tribune; one
page of testimony from Keith Hill, Local 241's president, who found out Brown had "won his
case" through email, texts, and Facebook; and one page from another CTA manager, Jairo
Naranjo (whose testimony Brown inaccurately attributes to DeJesus), who became aware
through "media coverage" that Brown requested coverage of gender-affirming surgeries, but
was apparently unaware of the ACLU's involvement. None of these citations would allow a
reasonable jury to conclude that news of Brown's advocacy with the ACLU was "widespread
through CTA." And again, the question is not whether Senior Manager Johnson could have,
or should have, known of Brown's protected activity: the question is whether Senior Manager
Johnson *did* know. *Lesiv*, 39. F4th at 915. The testimony upon which Brown relies would not
permit a reasonable jury to conclude that Senior Manager Johnson actually knew of Brown's
protected activities.

is no substitute for evidence at the summary judgment stage." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014). And "[s]peculative assertions about decisionmakers' knowledge are insufficient to establish a genuine dispute about a material fact." *Hamer v. Neighborhood Hous. Servs. of Chicago*, 897 F.3d 835, 841 (7th Cir. 2018).

Because the Court cannot speculate that Arlana Johnson actually knew of Brown's protected activities in 2017 and 2018,[12] Brown has not adduced evidence from which a reasonable jury could find in his favor on a Title VII retaliation claim.

## C. Brown's Equal Protection Claim

In his complaint, Brown raised a 42 U.S.C. § 1983 equal protection claim against CTA premised on a *Monell* theory of liability. [1] ¶¶ 52–59; [34] at 13; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

To survive summary judgment on a *Monell* claim, a plaintiff must show that he suffered a deprivation of a constitutional right proximately caused by either (1) an express policy; (2) a widespread practice or custom; or (3) an action by someone with final policymaking authority. *Stockton v. Milwaukee Cnty.,* 44 F.4th 605, 617 (7th Cir. 2022).

---

[12] Even assuming Brown had established actual knowledge on the part of Arlana Johnson, there remains a tenuous connection between any such knowledge and Brown's termination approximately three years later. Though the mere passage of time is not legally conclusive proof against retaliation, a significant time interval between protected activity and adverse employment action does weaken any inference of retaliation. *Malin v. Hospira, Inc.,* 762 F.3d 552, 559–60 (7th Cir. 2014).

In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must show causation by demonstrating that the municipality is the "moving force" behind the deprivation of constitutional rights. *Id.*

In his complaint, and as construed in a previous court order resolving defendants' motions to dismiss, Brown alleged that CTA formerly "had an express policy of depriving transgender employees with healthcare to cover gender transition," and that after it agreed to provide coverage for transition-related medical procedures, it "implicitly maintained" its former policy by firing Brown before his gender-affirming surgery, "the final and most costly part of the process." [34] at 13–14. The Court takes this to mean that Brown alleged a *Monell* claim under the "express policy" theory of liability. *See also* [22] at 6–7 (in opposing defendants' motions to dismiss, Brown described his *Monell* claim as alleging that "CTA had an express policy of depriving transgender employees with healthcare to cover gender transition, and then after he addressed it with them, CTA implicitly maintained this policy or custom by depriving Plaintiff with the equal healthcare coverage it had promised when he needed it").

Yet in opposing CTA's motion for summary judgment, Brown has changed tacks. He now argues that the jury must determine whether an individual with "final policymaking authority" decided to terminate him. [128] at 15. In so doing, Brown has abandoned any theory that his rights under the equal protection clause were violated by a CTA policy or custom. *See Perez v. Town of Cicero*, No. 06 C 4981, 2011 WL 4626034, at *3 (N.D. Ill. Sept. 30, 2011) (by defending his tort claim under a

different theory than the theory that was established in the complaint, the plaintiff abandoned the theory challenged by the defendant' motion for summary judgment); *Donelson v. City of Chicago*, 272 F. Supp. 2d 717, 726 (N.D. Ill. 2003) (concluding that plaintiff abandoned a sex-based harassment claim premised on a hostile work environment where the allegation was "raised in her complaint but not, significantly, reiterated in any subsequent documents").

Abandonment aside, Brown's equal protection claim still fails. Assuming that Brown's theory of liability under *Monell* could be premised at this late juncture on "an action by one with final policymaking authority," *see Stockton*, 44 F.4th at 617, for the reasons discussed in connection with Brown's Title VII retaliation claim, there is no genuine dispute here that the relevant decisionmaker was Arlana Johnson. So, contrary to Brown's contentions, there is nothing left for a jury to decide on this point.

Moreover, regardless of what *Monell* theory of liability he pursues, to raise a *Monell* claim, Brown must first show an underlying constitutional injury. *See Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015). "In a protected-class equal protection analysis, a plaintiff must show that defendant acted with a nefarious discriminatory purpose and discriminated against him based on his membership in a definable class." *Word v. City of Chicago*, 946 F.3d 391, 396 (7th Cir. 2020) (cleaned up). On summary judgment, the standard for analyzing discrimination claims under Title VII and § 1983 is the same holistic assessment: "whether the evidence would permit a reasonable factfinder to conclude that ... discrimination [based on gender identity] caused the adverse employment action."

23

*See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (citing *Ortiz*, 834 F.3d at 765). The determinative question to Brown's equal protection claim then is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. As discussed above, Brown has not presented any evidence that would permit a reasonable factfinder to conclude that he was dismissed because of his gender identity rather than because of his FMLA leave falsification. His equal protection claim therefore does not survive summary judgment.

### D. FMLA Interference

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). To survive summary judgment on his FMLA interference claim, Brown must show that (1) he was eligible for FMLA protections; (2) CTA was covered by FMLA; (3) Brown was entitled to take FMLA leave; (4) he provided sufficient notice of his intent to take leave; and (5) CTA denied him FMLA benefits to which he was entitled. *Curtis v. Costco Wholesale Corp.,* 807 F.3d 215, 223 (7th Cir. 2015).

CTA does not dispute that Brown was eligible for FMLA protections or that it was covered by FMLA. CTA denies, however, that Brown was entitled to take leave under FMLA because, it maintains, Brown did not qualify for such leave. [116] at 16. Brown, of course, takes a contrary position, arguing that a jury could reasonably conclude that he would have qualified for, and therefore been entitled to, FMLA leave

had Brown not been wrongly stymied by Dr. Bergin's second opinion and by the separate requirement that he obtain a third opinion once he received an adverse second one. *See* [128] at 17 (Brown argues that "the second opinion itself was not based on a medical assessment of Plaintiff but on a failure to provide medical records" and that "[p]resumably, the third opinion would have involved an actual exam, and the results would have been different"); *see also supra* at III.B.1 (discussing the various steps in CTA's FMLA application process); [1] ¶ 77 (Brown alleges in his complaint that CTA interfered with his FMLA rights by "requiring him to undergo multiple medical examinations by its selected physicians").

As the Court explains next, the version of events that Brown would like a jury to hear is unsupported by record material. The Court thus grants CTA summary judgment on Brown's FMLA interference claim.

### 1. Dr. Bergin's Opinion

Brown criticizes Dr. Bergin's opinion, upon which his FMLA denial was based, in multiple respects. First, he alleges that "at his deposition, Dr. Bergin gave the distinct impression that he found there were no objective findings to support [Brown's] subjective complaints ***because*** [Brown] did not provide him with medical records." [128] at 16 (emphasis in original) (quotations omitted). Second, Brown denies "ever actually being examined by Dr. Bergin in any real way." *Id.* Third, he claims that it is "not clear from the record who was responsible for providing Dr. Bergin with [Brown's] medical file" and that Brown "was never told he had to bring it to the appointment." *Id.* On this last point, Brown argues that if CTA, ReedGroup,

25

or Dr. Bergin's office were responsible for bringing his medical record to his appointment but failed to do so, "that is interference." *Id.*

To support all three assertions, Brown cites his response to CTA's statement of fact ¶ 46. *Id.* To support the relevant portion of that response, Brown cites a small portion of his own deposition testimony. [129] ¶ 46 (citing [112-11] at 68–69). There, Brown testified that Dr. Bergin asked him to describe his pain and touch his toes; that he did not recall Dr. Bergin taking any scans or x-rays; and that he could not recall whether or not Dr. Bergin asked any other questions, but that it was possible he did. *See* [112-11] at 68–69.[13] None of this testimony supports Brown's assertion that Dr. Bergin's opinion was premised on solely on Brown's failure to provide him with his medical records. And absolutely none in this testimony supports his suggestion that there is a factual dispute as to who was responsible for bringing his medical record to his appointment.

The Court therefore disregards Brown's arguments concerning Dr. Bergin's assessment.

### 2. ReedGroup's Third Opinion Process

Brown also lodges several arguments against ReedGroup, all of which suffer from similar evidentiary deficiencies.

Brown asserts that he spent "months … repeatedly reporting to both CTA and ReedGroup that he was having trouble scheduling the third appointment" and that he had no recourse other than "repeatedly telling CTA and ReedGroup that he was

---

[13] These page numbers refer to the page numbers of Brown's deposition transcript.

having these issues, to no avail." [128] at 16–17. To support this assertion, Brown cites his response to four of CTA's statements of fact. *Id.* (citing [129] at 28–31, ¶¶ 50–53). Because Brown gestures broadly to these four statements of fact, and because each statement of fact itself contains multiple allegations, the Court will only address those allegations that pertain to Brown's argument that he reported to CTA and ReedGroup "repeatedly" that he was having trouble scheduling the third opinion appointment.

CTA's statement of fact ¶ 50 alleges that MLS, ReedGroup's vendor for scheduling appointments for second and third opinions, sent Brown a letter via FedEx in September 2020, advising him on how to proceed with his third opinion appointment, and that MLS also called Brown so he could choose a provider for this appointment. [117] ¶ 50. In support of these assertions, CTA accurately cites to FedEx's confirmation of delivery, [117-2] at 474, and a subsequent email from a ReedGroup employee to one of CTA's Senior Human Resources Managers, indicating that MLS had sent two letters to Brown in September 2020 and that MLS had also called Brown concerning his third opinion appointment on an unspecified date. *Id.* at 477.

In an attempt to dispute these aspects of ¶ 50, Brown points out that the email between the ReedGroup employee and CTA's Senior Human Resources Manager was sent in December 2020 and argues that the email as a whole "lacks foundation." [129] at 28–29, ¶ 50. Yet he does not dispute the factual content of that email or the FedEx

delivery confirmation. *See Erickson*, 151 F. Supp. 2d at 960 (lack of foundation is not generally a bar to considering evidence at summary judgment).

He goes on: "Brown testified he did not recall ever receiving a letter or any phone call from CTA, ReedGroup, or its third-party vendor MLS regarding scheduling his third medical opinion, despite his phone calls to ReedGroup and MLS asking to schedule one." [129] at 28–29, ¶ 50. Brown cites four pages of his deposition to support this claim. *Id.* (citing [112-11] at 73:5–77:17). In those four pages, Brown testified that the address on top of the letter from MLS was his own; he did not recall whether he followed the letter's instructions to call MLS at a listed number after receiving it; he remembered instead calling ReedGroup after his October 7, 2020 suspension; he called MLS at the listed number to "ask them for information" sometime after December 11, 2020; he went to MLS's website and filled out a contact form; he called ReedGroup every week and asked to speak with his caseworker because the customer service representatives were not helpful; his caseworker sent him two emails saying that "they were waiting on [him] to complete … the third opinion to make a decision on the FMLA"; and he had trouble completing the third opinion because he "wasn't sure who to reach out to." [112-11] at 73:5–77:17. When counsel asked Brown why he was not sure who to reach out to despite receiving a letter that told him who to contact, Brown responded: "I don't recall receiving this letter." *Id.* at 77.

Nothing in this testimony rebuts the assertion that Brown received a letter from MLS concerning the third opinion appointment or that MLS called Brown concerning that appointment. *Cf. Tinder v. Pinkerton Sec.,* 305 F.3d 728, 736 (7th Cir.

2002) (witness's inability to recall whether she reviewed or saw a brochure did not raise a genuine issue as to whether she received it); *Gilbert v. City of Chicago*, 404 F. Supp. 3d 1215, 1219 (N.D. Ill. 2019) ("[T]here is a difference between not remembering and affirmatively stating something did not happen.") (cleaned up). The Court therefore treats CTA's statement of fact ¶ 50 as admitted.

Moving to CTA's statement of fact ¶ 51, CTA alleges that MLS's third opinion letter was delivered to Brown's address, as that address was confirmed by Brown in his deposition. [117] ¶ 51. In support of these assertions, CTA again cites FedEx's confirmation of delivery, [117-2] at 474, and Brown's testimony confirming that the letter was correctly addressed, [112-11] at 74. In response to ¶ 51, Brown again objects to the FedEx delivery confirmation as lacking foundation and again disputes that he received the letter from MLS directing him to schedule the third opinion appointment. To support this latter claim, he again cites the portion of his May deposition just discussed, [112-11] at 77, where Brown does not dispute receiving the letter, but only says that he does not recall receiving it. The Court takes statement of fact ¶ 51 as admitted.

Next, the relevant part of CTA's statement of fact ¶ 52 alleges that MLS had not heard from Brown as of October 6, 2020, and that Brown was not responsive to MLS's letters. [117] ¶ 52. Brown disputes this statement, again because he does not recall receiving any letter or phone call from CTA, ReedGroup, or MLS regarding scheduling his third medical opinion. [129] at 29–30, ¶ 52. Brown again cites the same

unsupportive snippet of his deposition transcript. [112-11] at 73–77. The Court takes this portion of statement of fact ¶ 52 as admitted.

Finally, the relevant portion of CTA's statement of fact ¶ 53 alleges that ReedGroup notified CTA that it had been unable to reach Brown so that he could select a third opinion provider and that, while MLS typically promptly notifies ReedGroup of an employee's unresponsiveness, it had not done so in this case. [117] ¶ 53. Brown disputes this statement, again because he does not recall receiving any letter or phone call from CTA, ReedGroup, or MLS regarding scheduling his third medical opinion. [129] at 30–31, ¶ 53. Brown again cites the same unsupportive snippet of his deposition transcript. [112-11] at 73–77. Brown makes further statements of fact, but to support them cites broadly to 18 transcript pages; cites indecipherably to "Exhibit 7, Hampton Dep. Exhibit 9, at CTA-Hampton"; and cites to 20 more deposition pages. [129] at 30–31, ¶ 53. These sweeping citations do not comply with Rule 56.1's requirement that any asserted facts "be supported by citation to the specific evidentiary material, including the specific page number, that supports it." N.D. Ill. R. 56.1(d). Attempting to substantiate Brown's assertions would force the Court to supply Brown's factual support for him. The Court takes statement of fact ¶ 53 as admitted.

Having completed this frustrating exercise, the Court thus disposes of Brown's argument that he reported to CTA and ReedGroup that he was having trouble scheduling the third opinion appointment, as it relies on unsupported statements of fact.

Brown next argues that ReedGroup never notified him of the results of his second medical opinion. [128] at 17. To support this assertion, he cites ¶¶ 24–25 of his additional statement of facts. *Id.* Brown's additional statement of fact ¶ 24, in turn, cites to Brown's testimony as to what he told DeJesus during an October 22, 2020 hearing: "I'm like, I don't understand what you're saying about a third opinion. No one has gotten back to me about the second one." [129] at 56, ¶ 24; [112-12] at 53:14–54:3. This is Brown's testimony regarding an out-of-court statement offered for the truth of the matter asserted. It is hearsay. Fed. R. Evid. 801(c). Brown's additional statement of fact ¶ 24 is therefore stricken. And because Brown's additional statement of fact ¶ 25 concerns CTA's policies and not ReedGroup's notice to Brown regarding his second medical opinion, the Court disregards Brown's additional statement of fact ¶ 25 and, with it, Brown's argument that ReedGroup never notified him of the results of the second medical opinion.[14]

Brown also alleges that "when ReedGroup notified CTA that [his] second opinion returned with 'no serious health condition/does not qualify for FMLA,' ReedGroup had still not received the second opinion report." [128] at 17 (citing [129] at 57, ¶ 26). To support this assertion, Brown cites an email exchange. [117-2] at 465. In the first email, sent from a CTA email address to ReedGroup and CTA email addresses, the sender writes that Brown's second opinion report is pending. *Id.* In the reply email, sent around an hour later from the ReedGroup email address to the CTA

---

[14] Even if this assertion were supported in fact, Brown does not explain its significance. If Brown was truly unaware that his second medical opinion had come back as a denial, why was he trying—for "months"—to schedule an appointment for a third opinion? [128] at 16–17.

email addresses, the sender writes that they have an update on Brown's report, which came back with "no serious health conditions/does not qualify for FMLA." *Id.* The cited email directly contradicts Brown's allegation.

Brown further alleges that CTA "unilaterally suspended the third medical opinion for [Brown] on July 1, 2020." [128] at 17 (citing [129] at 57, ¶ 26). To support this allegation, he cites a portion of Senior Human Resources Manager Hampton's deposition, in which she testified that the third medical opinion process was suspended for *all* CTA employees as part of an internal review. [130-1] at 83. This testimony does not support Brown's assertion that *his* third medical opinion was "unilaterally suspended." Brown's additional statement of fact ¶ 26 is unsupported by the record and is stricken.

Brown next puts forth two sweeping statements: "The record shows [Brown] repeatedly raising these issues. The record also shows ReedGroup consistently contradicting itself in emails to CTA about [Brown] and providing information to CTA that subsequently turns out to be false." [128] at 17. Brown never specifies what "these issues" are, how ReedGroup contradicted itself, or what information ReedGroup provided that turned out to be false. The Court turns to Brown's cited factual support in the hopes of finding clarity but is again disappointed: Brown cites four of his additional statements of fact, ¶¶ 26–29, each of which contains multiple factual allegations and citations (or, in the case of ¶ 28, no comprehensible citation to the record); instances of hearsay; and no factual support for Brown's claims. *See also*

[138] ¶¶ 26–29. Because Brown's argument is bereft of factual support, the Court disregards it.[15]

In sum, Brown has failed to present any genuine factual dispute that he was entitled to take FMLA leave. He has not established a genuine factual dispute that the second medical opinion lacked a sound basis or that he was thwarted in his efforts to obtain a favorable third medical opinion. And he has presented no evidence whatsoever (e.g., another medical opinion at this juncture) to support his argument that a reasonable jury could "presum[e]" that, had he actually obtained a third medical opinion, "the results would have been different" and would have established his entitlement to FMLA leave. [128] at 17. CTA's motion for summary judgment on Brown's FMLA interference claim is therefore granted.

### E. FMLA Retaliation

To prevail on his FMLA retaliation claim, Brown must show elements parallel to those in a Title VII retaliation claim: that he (1) engaged in a protected activity under the FMLA, (2) suffered an adverse employment action, and that (3) a causal link exists between the two. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018).

Brown does not muster any original argument on this claim. He simply gestures to his earlier arguments that his termination was pretextual, *see* [128] at 20. But those arguments do not supply a material factual dispute as to whether

---

[15] Brown also returns to his previous arguments that there was a change in FMLA leave call-out procedures and that CTA selectively enforced its policies because it did not punish DeJesus for failing to comply with an alleged weekly audit policy. [128] at 19. Because Brown does not connect these allegations with any argument concerning his entitlement to FMLA leave, and because the Court already found these contentions argument factually unsupported, the Court remains unpersuaded by these arguments.

Brown (1) engaged in a protected activity under the FMLA and (3) was dismissed *because* he engaged in that activity. The Court therefore treats Brown's FMLA retaliation claim as forfeited. *See Riley,* 909 F.3d at 190 ("[A] party opposing a summary judgment motion must inform the district court of the reasons why summary judgment should not be entered.").

The Court grants CTA's motion for summary judgment on this claim, too.

## V.    Conclusion

For the foregoing reasons, CTA's motion for summary judgment [115] is granted. Because the Court also grants Local 241's motion for summary judgment [110], for the reasons set forth in a separate memorandum opinion and order issued on this date, this civil case is terminated.

Georgia N. Alexakis
United States District Judge

Date: March 31, 2025

34